c

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
ALEXANDRIA DIVISION

| | |
|---|---|
| RICKY SHIRLEY, *ET AL.*, Plaintiffs | CIVIL ACTION NO. 1:21-CV-04458 |
| VERSUS | JUDGE DRELL |
| BELLE EXPLORATION INC., *ET AL.*, Defendants | MAGISTRATE JUDGE PEREZ-MONTES |

## REPORT AND RECOMMENDATION

Before the Court are the following motions: (1) Rule 12(b)(6) Motions to Dismiss (ECF Nos. 30, 103) filed by Defendant Belle Exploration, Inc. ("Belle"); (2) Rule 12(e) Motions for More Definite Statement and Rule 12(b)(6) Motions to Dismiss (ECF Nos. 45, 66, 102) filed by Defendants White River Operating, L.L.C. ("White River") and Day Town Operating, L.L.C. ("Day Town"); (3) Rule 12(b)(6) Motions to Dismiss (ECF Nos. 46, 63, 101) filed by Defendant Sanchez Oil & Gas Corporation ("SOG"); and (4) Rule 12(b)(6) Motions to Dismiss or Alternative Rule 12(e) Motions for More Definite Statement (ECF Nos. 82, 104) filed by Defendant Kepco Operating, Inc. ("Kepco").[1] Plaintiffs Ricky Shirley and Dana Shirley ("Plaintiffs") oppose the motions. ECF Nos. 43, 51, 52, 60, 71, 72, 81, 87.

---

[1] The Motions to Dismiss and Motions for More Definite Statement (ECF Nos. 101, 102, 103, 104) adopt the motions previously filed by the respective Defendants and assert their same arguments as to the Second Amended Complaint (ECF No. 82). The Second Amended Complaint corrected jurisdictional allegations, and thus the parties offered no additional briefing.

Defendants' Rule 12(b)(6) Motions to Dismiss (ECF Nos. 30, 45, 46, 63, 66, 82, 101, 102, 103, 104) should be DENIED IN PART and GRANTED IN PART, as follows:

Because Plaintiffs' claims are not barred by *res judicata* or collateral estoppel, Belle's Rule 12(b)(6) Motions to Dismiss (ECF Nos. 30, 103) should be DENIED IN PART on that basis.

Because Plaintiffs fail to state a claim for revendicatory relief, Defendants' Rule 12(b)(6) Motions to Dismiss (ECF Nos. 30, 45, 46, 63, 66, 82, 101, 103, 104) should be GRANTED IN PART to the extent they seek dismissal of Plaintiffs' revendicatory claim.  Plaintiffs' claims for revendicatory relief against Defendants should be DISMISSED WITH PREJUDICE.

Because Plaintiffs' claims under La. Civ. Code arts. 2305 and 2299 are not prescribed, Belle's Rule 12(b)(6) Motions to Dismiss (ECF No. 30, 103) and SOG's Rule 12(b)(6) Motions to Dismiss (ECF Nos. 46, 63, 101) should be DENIED IN PART to the extent they seek dismissal of those claims as prescribed.

Because Plaintiffs state sufficient claims for relief under La. Civ. Code arts. 2299 and 2305 for recovery of a thing not owed, Belle's Rule 12(b)(6) Motions to Dismiss (ECF Nos. 30, 103), SOG's Rule 12(b)(6) Motions to Dismiss (ECF Nos. 46, 63, 101), and Kepco's Rule 12(b)(6) Motion to Dismiss (ECF Nos. 82, 104) should be DENIED IN PART to the extent they seek dismissal of those claims.

I.    Background

Plaintiffs filed a Complaint (ECF No. 1) for state law claims for revendicatory relief and/or recovery of a thing not due or its value based upon diversity jurisdiction.

Of the originally named Defendants, the following Defendants remain:  SOG, White River, Day Town, Kepco, and Belle (collectively, "Defendants").[2]

Plaintiffs allege that "over the years," Defendants have produced oil from property owned by Plaintiffs under invalid leases with the State of Louisiana, Department of Natural Resources (the "State"), on and around the Catahoula Basin adjacent to Little River in LaSalle Parish, Louisiana.  ECF Nos. 1 at 4, 59 at 3.

Plaintiffs state that *Crooks v. Department of Natural Resources* – a class action for all riparian landowners in and around what was once known as "Catahoula Lake" – recognized in a 2016 judgment (the "*Crooks* judgment") that Plaintiffs were the owners of a portion of the bottom of the Catahoula Basin from the 36 mean sea level ("MSL") mark (high water mark) of Little River to the 24.08 MSL mark (low water mark) of Little River.  ECF Nos. 1 at 4-5, 59 at 3-4.  Plaintiffs claim this encompasses 22,000 acres to which the State previously claimed ownership as a natural lake bottom.  *Id.*

Plaintiffs assert that many years ago, the State had leased the same land to several oil and gas developers, including Defendants.  ECF No. 1 at 5, 59 at 4.  The oil and gas producers drilled several wells on the property, which produced oil in paying quantities for many years to present.  *Id.*

Plaintiffs allege the *Crooks* judgment recognized the State owed to the riparian owners a proportionate share of all oil royalties paid to the State from production by

---

[2] Four Rivers Exploration, Inc. ("Four Rivers"), Hunt Petroleum Corporation ("Hunt"), Axix Onshore, LP ("Axis"), Pryme Energy, LLC ("Pryme"), Exxon Mobil Corporation ("Exxon"), Transfuel Resources Company ("Transfuel"), Whiting Petroleum Corporation ("Whiting"), and Lamar Oil & Gas, Inc. ("Lamar") have been dismissed.  ECF Nos. 6, 42, 91, 93.

the oil and gas producers from 2003 to 2016, with interest. *Id.* Plaintiffs assert no relief was requested (or awarded) on behalf of the class, or any plaintiff, for the totality of the oil taken from the property under the leases granted by the State without authority. *Id.* Plaintiffs allege the effect of the *Crooks* judgment was to nullify the leases entered by the State with Defendants. *Id.* at 5.

Plaintiffs claim that many of the wells are on their property. *Id.* Plaintiffs assert claims, individually, against all Defendants for recovery of payments for all production obtained by each from the wells, under La. Civ. Code arts. 488 and 526. *Id.* at 5-6. Alternatively, Plaintiffs assert a claim for recovery of the value when the oil was alienated under La. Civ. Code Arts. 2299 and 2305. *Id.* at 7.

All remaining Defendants seek Rule 12(b)(6) dismissals of all claims. ECF Nos. 30, 45, 46, 63, 66, 82, 101, 102, 103, 104. White River, Day Town, and Kepco also seek a more definite statement under Rule 12(e). ECF Nos. 45, 66, 81, 102, 104.

Belle's initial Rule 12(b)(6) motion argues that the issues of fact which underlie Plaintiffs' claims were litigated to final judgment by this Court, and otherwise fail to state a claim. ECF No. 30. Belle further asserts Plaintiffs' claims fail because they fail to state they owned the relevant oil. ECF No. 30 at 8.

Plaintiffs opposed, asserting that the Complaint would be amended as counsel learned Plaintiffs had leased property in Sections 25 and 36 to Belle, but that they still state a claim against Belle for removal of their minerals without compensation. Plaintiffs dispute Belle's assertion that they seek to decide the same "boundary" line previously litigated. ECF No. 43 at 7.

White River and Day Town seek a more definite statement under Rule 12(e) and a Rule 12(b)(6) dismissal.  ECF Nos. 45, 66, 102.  White River and Day Town argue Plaintiffs make allegations collectively against all Defendants.  ECF No. 45 at 2-3.  They also assert Plaintiffs fail to identify the property they own, the mineral leases at issue, the parties to those leases, when those leases were granted, when the wells were drilled pursuant to those leases, or when each defendant operated a well or produced oil allegedly owned by Plaintiffs.  *Id.* at 3.  White River and Day Town seek to have Plaintiffs provide specific allegations as to each Defendant individually, including specifics concerning the property and leases at issue.  *Id.*

White River and Day Town further assert Plaintiffs' revendicatory action fails to state a claim for oil previously sold to date, including as to White River as it no longer operates on the property.  *Id.* at 4.  On subsequent motion, White River seems to abandon its request to dismiss the revendicatory action against Day Town.  ECF No. 66-1 at 3-4.  Also, neither White River nor Day Town seek dismissal of Plaintiffs' other claims.

SOG seeks a Rule 12(b)(6) dismissal, arguing that Plaintiffs' claims for revendicatory action fail because they do not seek the return of specific property.  ECF No. 46 at 1.  SOG asserts Plaintiffs' unjust enrichment claims against SOG are precluded as they have viable alternative claims against the State.  *Id.*  SOG further argues Plaintiffs' claims are barred by prescription.  *Id.*

Plaintiffs responded with an Amended and Restated Complaint ("Amended Complaint"), along with numerous attachments including the permits and plats of

the location of each well.  ECF No. 59.  They allege that their ownership of the land and minerals is beyond dispute[3] and that Defendants have removed minerals from their property over the last ten years.  ECF No. 59 at 1.  Plaintiffs seek return of any minerals removed that are still in Defendants' possession and seek payment of the value of the minerals taken and alienated by Defendants.  *Id.* at 2.  Plaintiffs claim Defendants drilled from various wells on their property at "different times and during different periods of production," including, but not limited to, Well Serial Numbers 214354, 28366, 127992, 107937, 228489, 230026, 242543, 238545 (the "Wells").  *Id.* at 3.

Plaintiffs allege the previous suit only addressed production and royalties from 2003 prior through trial, which was held between January 20 and 30, 2015.  *Id.* at 5.  They assert any claims against the producers for their removal of Plaintiffs' oil remain ripe and unresolved.  *Id.*

Plaintiffs further claim the *Crooks* district court ruling, which was affirmed in relevant part, held that the lease entered into by the State with Defendants are nullities.  *Id.*  Plaintiffs claim the State possessed neither ownership nor an executive right in the minerals to create a valid mineral lease.  *Id.*  Despite that fact, Defendants have continued to remove minerals without a valid lease or permission and have continued to pay royalties on those minerals to the State.  *Id.*  Plaintiffs' amendment includes more specific allegations concerning the production of numerous

---

[3] Plaintiffs allege a Louisiana District Court, the Louisiana Third Circuit Court of Appeal, and the Louisiana Supreme Court all held that Plaintiffs, along with other riparian landowners, are the owners of both the land and mineral rights at issue.  ECF Nos. 59 at 1, 59-1, 59-2, 59-3, 59-4, 59-5.

wells on State leases, including dates and estimated production. *Id.* at 5-6. Plaintiffs claim they owned the oil that was produced, owned the land, and possessed the exclusive right to explore and produce minerals from their property. *Id.* at 6.

Plaintiffs further allege the Defendants were on notice as of the May 16, 2016 *Crooks* ruling, as well as through updates provided by the State of the litigation. *Id.* at 7-8. On July 26, 2017, Plaintiffs sent Defendants copies of the *Crooks* judgment to Belle, SOG, and Kepco. *Id.* Plaintiffs allege that as owners of the minerals, they have a right of revendication to obtain a declaration of their ownership and an order requiring return of the minerals. *Id.* at 9. Plaintiffs state it is undisputed Defendants received minerals from Plaintiffs that were not owed and are required to return the value of any minerals that have been alienated, along with the fruits and products without a reduction for expenses. *Id.* at 10.

Belle responds by stating Plaintiffs make no allegation that Belle developed any land illicitly. ECF No. 70 at 2. Belle argues Plaintiffs allegations consist of asserting that Belle merely complied with its obligations under a mineral lease, and did not engage in any improper conduct. ECF No. 70 at 2.

 SOG seek dismissal of Plaintiffs' Amended Complaint (ECF No. 59). ECF No. 63. SOG argues that the claim for revendicatory action fails because the minerals are not subject to identification and that the claim for recovery of a payment of a thing not owed fails because there was no transfer or direct relationship between Plaintiffs and SOG. *Id.*

White River and Day Town amended their original motion (ECF No. 35), to assert the Amended Complaint (ECF No. 59) fails to cure the deficiencies. ECF No. 66. White River and Day Town still seek a more definite statement to identify the property plaintiffs. And White River seeks dismissal of the revendicatory action against it because the amendment admits White River has not operated the property since January 31, 2021. ECF No. 66-1 at 4.

Kepco also seeks a Rule 12(b)(6) dismissal, or alternatively a Rule 12(e) more definite statement. ECF No. 82. In lieu of any brief, Kepco adopted and incorporated all motions and supporting memoranda filed by Defendants. *Id.*

Plaintiffs oppose all motions. ECF Nos. 43, 51, 52, 60, 71, 72, 81, 87. Plaintiffs argue Defendants' motions are without merit, misstate law, that their claims have a basis in law and fact, and that the prior litigation does not bar their instant claims.

Following this Court's Jurisdictional Briefing Order (ECF No. 95), Plaintiffs filed a Second Amended and Restated Complaint ("Second Amended Complaint") (ECF No. 99) to properly allege the domiciles of members of White River and Day Town. The parties agreed to adopt the pending motions to dismiss as applicable to Plaintiffs' Second Amended Complaint. ECF Nos. 101, 102, 103, 104.

## II.    Law and Analysis

### A.    Plaintiffs' allegations must raise a plausible right to relief.

Under Fed. R. Civ. P. 12(b)(6), a court may dismiss all or part of a complaint for "failure to state a claim upon which relief can be granted."[4] But a complaint

---

[4] And Fed. R. Civ. P. 8(a)(2) requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief."

should not be dismissed "if it contains 'sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *Legate v. Livingston*, 822 F.3d 207, 210 (5th Cir. 2016) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009)) (internal citation and quotation omitted).

A complaint or claim is "facially plausible" when the facts alleged "allow a court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Arnold v. Williams*, 979 F.3d 262, 266 (5th Cir. 2020) (internal citation and quotation omitted). Factual allegations need not be detailed but must "raise a right to relief above the speculative level." *Serrano v. Customs & Border Patrol, U.S. Customs & Border Prot.*, 975 F.3d 488, 496 (5th Cir. 2020).

In deciding a motion to dismiss, a court must "accept[] all well-pleaded facts as true and view[] those facts in the light most favorable to the plaintiff." *Id.* at 496. However, a court need not accept as true "'conclusory allegations, unwarranted factual inferences, or legal conclusions.'" *Arnold*, 979 F.3d at 266 (quoting *Gentilello v. Rege*, 627 F.3d 540, 544 (5th Cir. 2010) (internal citation and quotation omitted)).

Courts generally are limited to the complaint and its proper attachments in considering a motion to dismiss. *Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 338 (5th Cir. 2008) (citation omitted). However, courts may rely upon "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Id.*; *Norris v. Hearst Trust*, 500 F.3d 454, 461 n. 9 (5th Cir. 2007) (citation omitted). Furthermore, "[d]ocuments that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's

complaint and are central to [its] claim." *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498-499 (5th Cir. 2000).

### B.    The Court takes judicial notice of prior state court proceedings.

There is a significant nearly 17-year history of related litigation concerning the property and mineral rights of the Catahoula Basin relevant to this suit.  In May of 2006, Steve Crooks and Era Crooks (the "Crooks") initiated litigation in state court on behalf of a class of riparian landowners.  *See Crooks v. State*, 2016 WL 3197532 (La. Dist. Ct. 2016).  In June of 2007, William Sanders ("Sanders") initiated separate litigation in state court, which was then removed to this Court.  *See Sanders v. Belle Expl., Inc.*, 481 Fed.Appx. 98 (5th Cir. 2011).

The Court takes judicial notice of the Louisiana state court decisions in *Crooks* and *Sanders*.  *See Stiel v. Heritage Numismatic Auctions, Inc.*, 816 F. App'x 888, 892 (5th Cir. 2020) (the court may "take judicial notice of the public records in . . . prior state court proceedings").  A discussion of the decisions is pertinent to the instant motions before the Court.

### 1.    *Crooks v. Department of Natural Resources*

Essentially, the Catahoula Basin, which was commonly known as a "lake" was determined to be a river, preserving the ownership of the banks – the area between the ordinary low and high watermarks – for riparian landowners.  *Crooks v. State*, 2016 WL 3197532, at *5 (La. Dist. Ct. May 17, 2016), *aff'd in part, vacated in part*, 263 So.3d 540 (La. App. 3 Cir. 12/28/18), *writ granted*, 269 So.3d 691 (La. 5/6/19), *aff'd in part, rev'd in part*, 340 So. 3d 574 (La. 1/29/20), *opinion corrected on reh'g* (Apr. 9,

2020).  The Louisiana Third Circuit Court of Appeal iterated pertinent facts and procedural history as follows:

> In 1962, the United States began constructing various structures in and around the Catahoula Basin pursuant to a congressionally-authorized navigation project under the River and Harbor Act of 1960 to promote navigation on the Ouachita and Black Rivers. In association with the project, the State of Louisiana and the United States signed an "Act of Assurances." Under the Act of Assurances, the State agreed to:
>
>> a. Furnish free of cost to the United States all lands, easements, and rights of way, including flowage rights in overflow areas, and suitable spoil-disposal areas necessary for construction of the project and for its subsequent maintenance, when and as required;
>> ....
>> c. Hold and save the United States free from damages due to construction and maintenance of the project[.]
>
> In connection with the project, the Catahoula Lake Water Level Management Agreement (hereinafter called the Water Level Management Agreement) was also developed and signed by the United States Army Corps of Engineers; the Bureau of Sport Fisheries and Wildlife, Fish and Wildlife Service, United States Department of the Interior; and the Louisiana Wildlife and Fisheries Commission. The agencies confected the agreement to ensure that proper water level management would protect the wildlife and public recreational opportunities in the Catahoula Basin, including an area known as Catahoula Lake. Upon completion of the project in 1972, the record indicates that the United States Fish and Wildlife Service began managing water levels in and around the Catahoula Basin in accordance with a seasonal schedule outlined in the agreement. As intended, these water management activities increased water levels in the Catahoula Basin and prolonged the natural annual high-water fluctuations. The record indicates that the United States Fish and Wildlife Service continues to manage the water levels in the Catahoula Basin to this day. Further, the record indicates that the State exercises jurisdiction of the Louisiana Department of Wildlife and Fisheries and has granted mineral leases in the area known as Catahoula Lake.

*Crooks v. State Through Dep't of Nat. Res.*, 350 So.3d 901, 904–05 (La. App. 3 Cir. 3/16/22), *writ granted*, 339 So.3d 621 (La. 6/22/22), and *rev'd*, 359 So.3d 448 (La.

1/1/23), *reh'g denied* (La. 3/16/23).  The State, through the Department of Wildlife and Fisheries, granted mineral leases in the area known as Catahoula Lake.  *Crooks v. Dep't of Nat. Res.*, 340 So.3d 574, 577 (La. 1/29/20), *opinion corrected on reh'g* (Apr. 9, 2020).

In 2006, the Crooks ("class plaintiffs") initiated a class action in state court against the Louisiana Department of Natural Resources ("LDNR") on behalf of a class of landowners in the Catahoula Basin whose property is affected by the increased water levels from the project.  *Id.*[5]  The class was subdivided into "Lake Plaintiffs" and "Swamp Plaintiffs" depending upon the location of their properties.  *Id.* at 906.  Lake Plaintiffs were described as "seeking to have all lands between the ordinary low and ordinary high water mark of the Little River within the area known as Catahoula Lake to be declared owned by the class in accordance with Louisiana's laws of riparian ownership."  *Id.*  Swamp Plaintiffs were described as "owners of 'overflow lands' located in the southwestern portion of the Catahoula Basin.  *Id.*

> The Lake Plaintiffs argued that, though referred to as a lake, the area known as Catahoula Lake actually constitutes the banks of a body of water in the Catahoula Basin called Little River and thus is owned by the Lake Plaintiffs in accordance with Louisiana's laws of riparian ownership. They asserted that, prior to construction of the project and management of the water levels in the Catahoula Basin, Little River crossed the Catahoula Basin and seasonally overflowed its banks. They argued that, during overflow periods, Little River expanded across the entire Catahoula Basin and was mistakenly called Catahoula Lake. Thus, as detailed in the above quote, the Lake Plaintiffs sought to be declared owners of the area between the ordinary low water mark and the ordinary high water mark of Little River.

---

[5] Belle states that in 2012, after a trial, appeal, and writ opinion, class plaintiffs amended their petition to included additional oil and gas companies including Belle. ECF Nos. 30 at 3, 30-1 at 2.  SOG asserts it was not (and is not) a defendant in the *Crooks* case.  ECF No. 46-1 at 7.

*Id.*

The district court granted the State's motion for partial summary judgment asserting legal status of the area as a lake. The landowners appealed. The Third Circuit Court of Appeal reversed and remanded. *See Crooks, et ux. v. State, Dep't of Nat. Res.*, 81 So. 3d 47 (La. App. 3 Cir. 12/7/11).

On remand, after bench trial,[6] the trial court found in favor of Class Plaintiffs that, in 1812, the area known as Catahoula Lake was a permanent river that seasonally flowed and covered its banks. *Crooks*, 263 So.3d at 556. The trial court found that the riverbanks consists of "22,813,84[sic] acres of lands located between the ordinary low water mark of the Little River and the ordinary high water mark of 36 mean sea level of the Little River." *Id.* at 553. The trial court thus recognized the Lake Plaintiffs as the owners of the riverbanks and ordered the State to pay damages for expropriation and mineral royalties received from production from the riverbanks under the riverbank leases between May 2003 and the date of trial.[7] *Crooks v. State*

---

[6] A ten-day bench trial was conducted in January of 2015. The trial court issued its Written Reasons for Judgment on May 16, 2017. And the trial court rendered a final judgment in May of 2017. *Crooks v. State through Dep't of Nat. Res.*, 343 So.3d 248 (La.App. 3 Cir. 6/29/22), *writ denied*, 349 So.3d 2 (La. 11/1/22).

[7] The judgment was silent as to the validity of the leases or the effect of its ruling on the existing leases. The trial court held that the actions of the State in granting the leases on the immovable property and the continuing production of oil and gas from these leases is a continuing trespass on the immovable property of the plaintiffs and class members, constituting a continuing tort. *Crooks*, 2016 WL 3197532, at *28. Thus, the court found that plaintiffs and the class members are entitled to "repayment of all royalties and other payments received by the State derived from oil, gas, and mineral activities and production conducted on the immovable property of plaintiffs and members of the class" that was the subject of the proceedings. *Id.*

13

*Through Dep't of Nat. Res.*, 359 So.3d 448, 450 (La. 1/1/23, 1–2), *reh'g denied* (La. 3/16/23).  The trial court also denied the State's exception of no right of action.[8]  *Id.* The State appealed, asserting, among other errors, that the district court erred in determining the area is not a lake and in not setting the location of the ordinary low water mark to accurately determine the size of the allegedly taken property.  263 So. 3d at 540.

On appeal, the Third Circuit Court of Appeal affirmed in part, vacated in part, and rendered the judgment of the trial court.  *Crooks*, 263 So. 3d at 567.  The Third Circuit held that the State was prohibited from acquiring private property through acquisitive prescription; that evidence was sufficient that the area known as "Catahoula Lake" was actually a permanent river; that a one-year prescriptive period applied to the landowners' claims; that the State failed to establish that subsequent purchasers lacked a right of action for inverse condemnation; and that the

---

The trial court determined that because the area is a permanent river the "Lake Plaintiffs" are "entitled to recovery the mineral royalties attributable to the riparian lands and which have been erroneously paid to the [S]tate over the years."  *Id.* at 45.  However, it was undisputed that plaintiffs only sought to recover the royalties attributable to these leases during the three years before suit was filed as well as royalties to the date of trial.  *Id.*  The amount of royalties was undisputed, and the court found the "riparian landowners are entitled and decreed the owners of those designated funds."  *Id.*  However, the trial court was silent regarding the leases themselves or the ownership of royalties attributable to future production post-trial.

[8] The trial court found that the United States is the party that inversely condemned the plaintiffs' land, but the Act of Assurances provided an agreement that the State became the indemnifier of the United States.  263 So. 3d at 549.  Thus, the trial court concluded plaintiffs as third-party beneficiaries could bring their inverse condemnation claims directly against the State.  *Id.*  The trial court also concluded a subsequent purchaser can assert a right of action.  *Id.*  The trial court also denied the State's exception of liberative prescription, concluding that a one-year prescriptive period applied but that plaintiffs' inverse condemnation claims had not prescribed according to the continuous tort doctrine.  *Id.*

14

landowners were not entitled to attorney's fees. *Id.* at 540. The Third Circuit noted that one of the State's arguments on appeal was that the trial court erred in not setting "the location of the ordinary low water mark to accurately determine the size of the allegedly taken property." *Id.* at 552. It affirmed the trial court's rulings relating to the acreage and value per acre, and found no abuse of discretion in the trial court's determination of damages. *Id.*

The Third Circuit vacated the trial court's award of attorney's fees, costs, and fees, finding that La. R.S. 13:5111 did not apply. *Id.* at 565. It ordered an award of attorney's fees, an amount for administration of the claims process post-trial, an incentive award to Crooks assessed against the common fund under La. Code Civ. P. art. 595, in addition to an award of expert witness fees and costs rendered against the State. *Id.* at 567. The judgment was otherwise affirmed. *Id.* The State was granted writ of certiorari and filed peremptory exceptions of prescription and no cause of action. *Crooks v. Dep't of Nat. Res.*, 340 So.3d 574 (La. 1/29/20), *opinion corrected on reh'g* (Apr. 9, 2020).

On certiorari review, the Louisiana Supreme Court overturned the landowners' inverse condemnation claims as barred by prescription, but it left intact the ruling that the Catahoula Basin is a river rather than a lake and it overruled the State's exceptions of no cause of action as to mineral royalties. *Crooks*, 340 So.3d at 587. In addressing the procedural history after the final judgment, the Louisiana Supreme Court observed:

> After all legal delays expired, the judgment became final ("the Royalties Judgment").

> When LDNR failed to satisfy the Royalties Judgment, Class Plaintiffs sought a mandamus to enforce its payment arguing that depositing funds into the registry of the court to comply with a final judgment is a ministerial act. LDNR opposed arguing that mandamus violates La. Const. art. XII, § 10(C) and La. R.S. 13:5109(B)(2) and that the funds sought were unavailable. The trial court denied the writ of mandamus. The court of appeal reversed, finding that mandamus is an appropriate remedy as the funds sought were not public funds and the judgment could not be enforced by ordinary means. *Crooks,* 21-0663, pp. 10-11, 350 So.3d at 909–10.

*Crooks*, 359 So.3d at 450.[9]

The State applied for a writ, which was granted.  339 So. 3d 621 (La. 6/22/22). The issue before the Louisiana Supreme Court was whether mandamus may lie to satisfy the payment of the Royalties Judgment.  *Crooks*, 359 So. 3d at 450.  The Louisiana Supreme Court recognized that Class Plaintiffs were entitled to payment of the Royalties Judgment.  *Id.* at 451.

However, the Louisiana Supreme Court reversed the court of appeal and reinstated the trial court judgment, rejecting the court of appeal's finding that the funds subject to the Royalties Judgment were not public funds thus warranting mandamus.  *Id.* at 452.[10]  Rehearing was denied.  *Crooks v. State Through Dep't of Nat. Res.*, 2022-00625, p. 1 (La. 3/16/23).

---

[9] "While the [Louisiana Supreme Court] specifically overruled the sums awarded for inverse condemnation, it did not make any statements regarding the mineral royalty award, but did state, "In all other respects, the judgment is affirmed."  *Crooks*, 343 So.3d at 256.

[10] The court stated that the funds received from the mineral leases were public funds as they were deposited into the State's general fund and are not subject to seizure.  *Id.*  The court stated that the Royalties Judgment is payable only when funds are appropriated by the legislature; thus, the court of appeal erred in issuing the writ of mandamus.  *Id.*

16

The *Crooks* case proceeded in state court to resolve further issues.[11]  Plaintiffs sought partition of the property of the individual plaintiffs based on the final judgment and its attached map, including a request to delineate the boundaries of both the riverbed and river bank, and to partition the acreage of riparian land to provide each owner with a proportionate share. *Crooks v. State through Dep't of Nat. Res.*, 343 So.3d 248, 256 (La.App. 3 Cir. 6/29/22), *writ denied*, 349 So.3d 2 (La. 11/1/22).  The trial court denied the State's exception for unauthorized use of a summary proceeding, granted the landowners' exception of *res judicata*, made rulings on motions in limine and to exclude or limit expert testimony, and made findings on the ordinary low water mark of the river.  *Id.* at 248.

The State asserted at the trial level that "future royalties were not part of the trial court judgment and do not belong to the Class but will belong to the proper landowners once boundaries are established."[12]  *Id.* at 257.  "On June 17, 2021, the trial court rendered a judgment following a June 4, 2021 hearing on the plaintiffs' motion regarding issues on remand."  *Id.* at 257.  The trial court denied plaintiffs' motion for mandamus or contempt and granted plaintiffs' motion "to determine the

---

[11] The Third Circuit noted that the record resumed with the appeal of "what began with Plaintiffs' Motion Regarding Issues on Remand (With Incorporated Memorandum of Authorities)" filed on July 6, 2020.  343 So.3d at 256.  It should be noted that Westlaw shows this ruling, 343 So. 3d 248, as an appeal of *Crooks*, 350 So. 3d 901, which was the appeal of the trial court's denial of a writ of mandamus to compel payment of the judgment and for sanctions.  However, that appears to be incorrect.  Notably, none of the parties seem to address this ruling which found the ordinary low water mark to be 24.08 MSL, as affirmed by the Third Circuit.

[12] The State did not dispute the finality of the judgment for an award of past royalties.  343 So.3d at 257.

low-water mark of the Little River within two months." *Id.* It denied the State's request for additional time set for trial the issue of the low-water mark. *Id.* at 257-58.

Following a hearing on August 10, 2021, the trial court rendered judgment denying the State's exception for unauthorized use of summary proceeding, granting the plaintiffs' exception of *res judicata*, denying the plaintiffs' motion to exclude the testimony of the State's expert witnesses, and finding that the ordinary low-water mark of the Little River within the Catahoula Basin is 24.08 feet above MSL. *Id.* at 261. It further found that "the contours of that ordinary low water mark of 24.08 feet above MSL are shown on the surveys prepared by Michael Mayeux and introduced into evidence as Exhibits P-11 and P-12," which were adopted as part of the judgment and attached." *Id.* The State appealed and filed exceptions of lack of subject matter jurisdiction no cause of action on appeal." *Id.* at 261.

On appeal, the Third Circuit noted that "[w]hile it has already been held that the body of water in question is a river rather than a lake, the low-water mark needed to be determined in order to classify what belonged to the riparian owners versus what was owned by the State." *Id.* at 254. The trial court determined the low-water mark to be at 24.08 feet in the Little River located in the Catahoula Basin. *Id.*

The Third Circuit denied the State's exceptions and affirmed in part and reversed in part the trial court's ruling. *Id.* at 261. The Third Circuit noted that the Louisiana Supreme Court rendered final judgment when it affirmed that the Catahoula Basin is actually a river, and it did not remand the case for any

proceedings. *Id.* at 266. And it noted that the final judgment did not address the boundary issue or remand for a determination of the boundary issue of the low-water mark. *Id.* The Third Circuit held that the trial court proceedings were not "summary proceedings," but merely a "continuation of the ordinary proceedings instituted in 2006 when the initial petition stated it was a class action petition to fix boundary." *Id.* at 268.

The Third Circuit held that the trial court legally erred in granting plaintiffs' exception of *res judicata*, noting that the relationship of the exact location of the low-water mark to the location of gas wells had not been litigated. *Id.* at 273. The Third Circuit found that the former trial court did award mineral interests attributable to mineral production from May 2003 through the date of trial, but made no finding as to the location of the gas wells in relation to the low-water mark. *Id.* It observed that the location of the wells are a matter of public record. *Id.* But the court found no evidence in the entire record in the case of any finding by the former trial court regarding the low-water mark based on scientific evidence and the location of the gas wells. *Id.* The Third Circuit further noted the trial court provided no discussion or written reasons for granting plaintiffs' exception of *res judicata*. *Id.*

The Third Circuit stated that the sole purpose of the August 10, 2021 hearing was to determine the location of the low-water mark.[13] *Id.* The trial court found the

---

[13] The Third Circuit noted that it "did not disagree that the legal conclusion must be that the profit from the wells already awarded was above the yet-to-be-determined low water mark, it could not substitute that legal finding for the scientific one that establishes the *actual* low water mark, the sole reason for the hearing. 343 So.3d at 273. It acknowledged that the previous award of mineral interests is, however, *res judicata*. *Id.* at n.3.

plaintiffs' witnesses' testimony reliable and corroborated by data, and it accepted the testimony that the low-water mark is 24.08 feet. *Id.* at 279. The Third Circuit noted that none of the State's witnesses would testify as to an exact low-water mark. *Id.* at 274. After reviewing the State's proffered witness testimony, the Third Circuit held that the trial court did not err in excluding testimony of the State's witnesses, who all admitted at the hearing that they could not give an elevation representing the low-water mark. *Id.* The Third Circuit found no error in the trial court's factual finding, and affirmed, that the low-water mark is located at 24.08 feet. *Id.* at 281. It reversed the trial court's grant of *res judicata. Id.* The Louisiana Supreme Court denied writs. 349 So.3d 2 (La. 11/1/22).

### 2. *Sanders v. Belle Exploration, Inc.*

In a related case brought solely against Belle, this Court conducted a three-day bench trial and entered judgment in favor of Belle. *Sanders v. Belle Expl., Inc.*, 481 Fed.Appx. 98, 100 (5th Cir. 2011). In July 2000, William Henry Sanders ("Sanders") and his wife, along with Plaintiffs, executed a lease in favor of Belle applicable to all their lands and mineral interests in Sections 25 and 30 of LaSalle Parish,[14] retaining a one-fifth royalty interest in any mineral production from the leased lands. Reasons for Judgment, ECF No. 65 at 1, *Sanders v. Belle Exploration, Inc.*, No. 1:07-cv-01108 (W.D. La. 5/3/2/10).

> In 2002, the Louisiana State Mineral Board (the "Mineral Board") passed two resolutions concerning the land at issue here. The resolutions conceded to private ownership of mineral rights in all lands

---

[14] Sanders owns lands and mineral interests in Sections 25 and 30, along with the Shirleys. *Sanders*, 481 Fed.Appx. at 100.

> above the thirty-six foot mean sea level contour in certain parcels in the vicinity of Catahoula Lake, including some of the Leased Lands. At nearly the same time, the Louisiana Commissioner of Conservation (the "Commissioner") ordered the forced pooling and unitization of property including the Leased Lands, resulting in the creation of numbered sand units ("SU") 116 through 122. This case concerns SU 117 and SU 118. SU 117 includes portions of the Leased Lands adjacent to Catahoula Lake; SU 118 does not.

*Sanders*, 481 Fed.Appx. at 100.[15]

Sanders filed suit in state court against Belle, alleging Belle had improperly determined the boundary between his property and the State's in and around Catahoula Lake, resulting in underrepresentation of the Sanders's interest and that Belle had breached the lease by failing to pay royalties.[16]  *Sanders*, 481 Fed.Appx. at 100.  Belle removed to federal court, and judgment was issued after a bench trial.  *Id.*

This Court agreed with Belle that the proper reference for the boundary line between the Sanders's interest in SU 117 and the State's is a 1942 survey conducted under the Louisiana Department of Public Works.  *Id.* at 101.  Sanders sought to use a 2001 survey he ordered, which would have expanded the leased land.  *Id.*  This Court relied on a Louisiana Third Circuit case, *Sanders v. State*, 973 So. 2d 879 (La.

---

[15] Notably, the Fifth Circuit relied on the parties' agreement that the Catahoula Lake is a navigable lake and the presumption that the State owns all the lands and mineral rights up to the ordinary high water mark of a navigable lake such as this one.  481 Fed.Appx. at 100, n.1.

[16] In its denial of partial summary judgment, this Court recognized that in prior state court litigation, the Twelfth Judicial District Court rendered partial judgment in June 2005, in favor of Sanders and against the State, recognizing Sander's mineral ownership and possession of land in Section 30 (as well as Lot 1 of Section 25) "situated above the 36' mean sea level contour."  That judgment became a final judgment but did not resolve all of the issues in that case.  *Sanders*, 2008 WL 11381933, at *2.  But this Court recognized that the final judgment did not specify how the contour line was to be determined.  *Id.* at 3.

App. 3 Cir. 12/19/07)[17] and its own assessment of the evidence after a full trial. *Id.* at 102. This Court determined that the 1942 survey line was the more accurate boundary line between the State's and the Sanders's land, even though it was a meander survey. *Id.* And it was determined that the ordinary high-water mark of Catahoula Lake is thirty-six-foot MSL contour. *Id.* at 100. The State owns all land and mineral rights up to the ordinary high-water mark of a navigable lake such as Catahoula Lake. *Id.*

This Court found that Sanders was barred from a redetermination of the 36-foot MSL contour line against Belle, even though Belle was not a party to the Third Circuit suit in which that issue was decided. Reasons for Judgment, ECF No. 65 at 9, *Sanders v. Belle Exploration, Inc.*, No. 1:07-cv-01108 (W.D. La. 5/3/2/10). This Court clarified that the 36-foot foot MSL contour boundary applies to both surface and mineral ownership. *Id.*

On appeal, the United States Fifth Circuit held that this Court reasonably relied on the 1942 survey that determined the approximate location of the lake and plotted sinuosities of the shoreline even though the survey utilized a meander line. *Sanders*, 481 Fed.Appx. at 98.[18]

---

[17] In *Sanders v. State,* 973 So.2d 879, the Louisiana Court of Appeals for the Third Circuit reversed a possessory judgment in favor of Sanders and against the State of Louisiana as to the lands between the thirty and one-tenth feet MSL and thirty-six feet MSL. *Id.* at 880. The Louisiana court held that "the ordinary high water mark [of Catahoula Lake] in 1812 was 36 feet MSL as surveyed by Heard and Daigre in 1942." *Id.* at 887.

[18] The Fifth Circuit also declined to entertain Sanders' unconstitutional taking argument on appeal, as it was never made to the district court. *Sanders*, 481 Fed.Appx. at 103.

### C.    Plaintiffs' action is not barred by *res judicata*.

Belle frames Plaintiffs' suit as an action to set a boundary line between Plaintiffs' land and land owned by the State.  ECF No. 30-1 at 1.  However, the Court does not agree.  Instead, Plaintiffs assert two counts, neither which seek to set a boundary line.[19]  Plaintiffs represent – and their Complaint (ECF No. 1), as amended (ECF No. 59) alleges – that they seek a "right of revendication" requesting the return of any oil removed by each Defendant from Plaintiffs' property and still in possession of Defendants, and/or the monetary value of the oil, along with any fruits or products.  ECF No. 59 at 11.  As to Belle, Plaintiffs specifically allege they seek from Belle all oil and/or payments attributable to the lands leased by the State to Belle that are, and were, actually owned by Plaintiffs under the *Crooks* judgment, or alternatively, for the royalties paid to the State since the rendering of the judgment in *Crooks*.  *Id.*

Belle argues the doctrine of *res judicata* applies to Plaintiffs' suit and is appropriate for a Rule 12(b)(6) motion.  *Id.* at 4.  Specifically, Belle claims this action is barred by collateral estoppel or issue preclusion as this boundary was already established in *Sanders v. Belle Exploration, Inc.*, 1:07-cv-1108.  *Id.* at 1.

---

[19] Plaintiffs' Complaint (ECF No. 1), as amended (ECF No. 59), alleges ownership of the land and minerals in LaSalle Parish, Louisiana.  Plaintiffs attach various previous state court decisions related to the boundary dispute.  ECF No. 59.  Plaintiffs factually allege that they were recognized as riparian landowners in and around "Catahoula Lake" from the 36-foot MSL high water mark) to the 24.08 MSL low water mark.  *Id.* at 4.  Plaintiffs concede that the state court suit was directed only to the State and the State was ordered to pay royalties from 2003 to the date of trial in 2016.  *Id.*  And they concede the state court judgment did not seek or provide relief in relation to any claims against the producers who removed the oil.  *Id.*  Defendants dispute Plaintiffs' allegations of underlying facts.  However, at this stage of the proceedings, factual allegations contained in a complaint are accepted as true.  *Legate v. Livingston*, 822 F.3d at 210.

Belle contends Plaintiffs should be barred by issue preclusion from relitigating issues of fact that were settled by the previous judgment, even if arising between different parties than in the original dispute. ECF No. 30-1 at 5. Belle claims that the judgment in *Sanders* set the boundary line between the "Leased Land (owned in part by the Shirleys and leased in indivision with the Sanders) at the 36-foot MSL mark of Catahoula Lake." *Id.* at 5-6. Belle argues that Plaintiffs now seek to "recognize" that the boundary between their land and the State-owned land is at the 24.08-foot MSL mark – a location other than that determined by this Court in *Sanders. Id.* at 6. Belle contends that the "size" of the mineral lease was recognized in *Sanders* and Plaintiffs are precluded from raising it again. ECF No. 44 at 2.

Belle further asserts it was not a party to *Crooks*. However, it contends *Crooks* did not address the State-issued mineral leases on the relevant land, did not invalidate them wholesale, and did not order mineral lessees like Belle to make any payments to private landowners. *Id.* at 2. Belle also contends that a court decision concerning ownership of land that is subject to a mineral lease does not automatically have any effect on that lease. *Id.* (citing *Bonnett v. Mize*, 556 So.2d 228, 235 (La. App. 2 Cir. 1/24/90)).

Plaintiffs respond that the Louisiana Supreme Court recognized them and adjacent landowners as the owners of Catahoula Basin from the high-water mark of 36-feet MSL to the low water mark of Little River. ECF No. 43. Plaintiffs assert that the basis of the ruling is that the basin is not a natural lake as claims for years by the State but is an overflow of Little River. *Id.* at 5. Plaintiffs argue Belle and other

producers have continued to remove minerals from their property and pay royalties to the State, despite the judgment having been in effect for nearly five years.  *Id.*  Plaintiffs state they seek "return of the oil still in the producer's possession and compensation for any oil that defendants have removed and sold."  *Id.*  Plaintiffs admit that since originally filing suit their counsel learned that Plaintiffs leased property in Sections 25 and 26 to Belle, under which Belle paid one-third of the royalties to the State as a unit owner.  *Id.*

Plaintiffs refute that earlier litigation precludes this action.  *Id.* at 5.  Plaintiffs represent that they do not seek to relitigate the boundary line between Plaintiffs and the State and concede that the boundary issue cannot be relitigated.  ECF No. 43 at 6.  Instead, Plaintiffs state they merely pleaded the boundary as a factual assertion of what happened in state courts.[20]  *Id.*  Plaintiffs further contend state law, not federal law, applies to issue preclusion in diversity cases.  *Id.* at 7.

Plaintiffs point out that in *Sanders* this Court already found issue preclusion under La. R.S. 13:4231, recognizing the boundary had already been set by a Louisiana state court.  *Id.*  Plaintiffs state that the boundary line has been set as the high-water mark of "Catahoula Basin" at the 36-foot MSL in 1812 as provided in the 1942 Heard and Daigre survey.  *Id.* at 6-7.  Thus, Plaintiffs contend this action asserts claims for oil produced under invalid leases from the State from oil wells located at the bottom

---

[20] Plaintiffs state they simply pleaded as a factual allegation what happened in the lower courts – that the basin was determined not to be a lake, but the overflow of Little River, making them the owners of the basin to the low water mark of Little River.  ECF No. 43 at 6.

of Catahoula Basin. *Id.* at 8-9. And Plaintiffs contend those claims are not precluded. *Id.* at 11.

> The United States Court of Appeals for the Fifth Circuit holds that:
>
> Generally, res judicata cannot be raised in a motion to dismiss; it must be pleaded as an affirmative defense. *Test Masters Educ. Servs., Inc. v. Singh*, 428 F.3d 559, 570 n.2 (5th Cir. 2005) (citing 5 Charles Alan Wright & Arthur R. Miller, Fed. Prac. & Proc. § 1357 (3d ed.)). However, we have permitted dismissal under Rule 12(b)(6) on the basis of res judicata "when the elements of res judicata are apparent on the face of the pleadings." *Stevens v. St. Tammany Par. Gov't*, 17 F.4th 563, 571 (5th Cir. 2021) (citing *Murry v. Gen. Servs. Admin.*, 553 F. App'x 362, 364 (5th Cir. 2014) (per curiam) (unpublished)); *see also* Wright & Miller, Fed. Prac. & Proc. § 1357. We may also "consider documents attached to or incorporated in the complaint and matters of which judicial notice may be taken." *United States ex rel. Willard v. Humana Health Plan of Tex. Inc.*, 336 F. 3d 375, 379 (5th Cir. 2003); *see also Dean v. Mississippi Bd. of Bar Admissions*, 394 F. App'x 172, 175 (5th Cir. 2010) (per curiam) (unpublished).
>
> "A federal court, asked to give res judicata effect to a state court judgment, must apply the res judicata principles of the law of the state whose decision is set up as a bar to further litigation." *Hernandez v. City of Lafayette*, 699 F.2d 734, 736 (5th Cir. 1983).

*Guardino v. Hart*, 22-20278, 2023 WL 3818378, at *3 (5th Cir. June 5, 2023). However, the Fifth Circuit has explained that a 12(b)(6) motion to dismiss properly raises *res judicata* when "the facts are admitted or not controverted or are conclusively established." *Meyers v. Textron, Inc.*, 540 F. App'x 408, 410 (5th Cir. 2013) (quoting Clifton v. Warnaco, Inc., 53 F.3d 1280,1995 WL 295863, at *6 n.13 (5th Cir. 1995) (per curiam)).

Here, there are both prior state court judgments and prior federal court judgments raised by Defendants. Generally, federal common law determines the *res judicata* effect of a prior federal court judgment. *Comer v. Murphy Oil USA, Inc.*, 718

F.3d 460, 46667 (5th Cir. 2013); *see also Dotson v. Atl. Specialty Ins. Co.*, 24 F.4th 999, 1002–03 (5th Cir.2022), *cert. denied,* 143 S.Ct. 102; 214 L.Ed.2d 22 (2022) (citing *Semtek Int'l Inc. v. Lockheed Martin Corp.*, 531 U.S. 497, 508 (2001)). And "[t]o determine the preclusive effect of a state court judgment in a federal action, courts must apply the law of the state from which the judgment emerged." *Dotson*, 24 F.4th at 1002 (quoting *Black v. N. Panola Sch. Dist.*, 461 F.3d 584, 588 (5th Cir. 2006)).

Regardless, "[a]s a matter of federal common law, federal courts sitting in diversity apply the preclusion law of the forum state unless it is incompatible with federal interests." *Dotson*, 24 F.4th at 1002–03 (citing *Anderson v. Wells Fargo Bank, N.A.*, 953 F.3d 311, 314 (5th Cir. 2020)). Thus, Louisiana law determines the preclusive effect, if any, the *Crooks* and *Sanders* actions have on the claims here. *See id.*

La. R.S. 13:4231 "embraces the broad usage of the phrase 'res judicata' to include both claim preclusion (res judicata) and issue preclusion (collateral estoppel)." *Certified Fin., Inc. v. Cunard*, 838 So.2d 1, 6 (La. App. 1 Cir. 2002). "Under issue preclusion or collateral estoppel . . . once a court decides an issue of fact or law necessary to its judgment, that decision precludes relitigation of the same issue in a different cause of action between the same parties." *Id.* However, collateral estoppel must be strictly construed, and only applies in attempts to relitigate issues which have been determined in prior lawsuits between the "same parties." *Foley v. Entergy La., Inc.*, 946 So. 2d 144, 156-57 (La. 2006). The requirement of "[i]dentify of parties can also be satisfied when a privy of one of the parties is involved." *Burguieres v.*

*Pollingue*, 843 So. 2d 1049, 1054 (La. 2003) (citing *Welch v. Crown Zellerbach Corp.*, 359 So. 2d 154, 156 (La. 1978)).

The Louisiana Supreme Court interpreted the "same parties" requirement as it applies to collateral estoppel, and reaffirmed that "the preclusive effect of an earlier judgment could bind a nonparty plaintiff whose interest were adequately represented by parties to the prior litigation." *Williams v. Orleans Levee Dist.*, 2010 WL 1302918, at *1 (La. 4/5/10) (citing *Forum for Equality PAC v. McKeithen*, 893 So. 2d 738 (La. 2005)). The Louisiana Supreme Court has held that a party asserting *res judicata* must prove five elements: (1) the judgment is valid; (2) the judgment is final; (3) the parties are the same; (4) the cause or causes of action asserted in the second suit existed at the time of the judgment in the first litigation; and (5) the cause of causes of action asserted in the second suit arouse out of the transaction or occurrence that was the subject matter of the first litigation. *Burguieres v. Pollingue*, 02-1385 (La. 2/25/03), 843 So. 2d 1049, 1052; *Oliver v. Orleans Parish Sch. Bd.*, 14-0329 (La. 10/31/14), 156 So. 3d 596, 612.

The Court is not convinced that the instant lawsuit is the same claim or cause of action as the previous litigation in both *Crooks* and *Sanders*. This Court has already barred a redetermination of the 36-foot MSL contour line against Belle, even though Belle was not a party to the Third Circuit suit in which that issue was decided. Reasons for Judgment, ECF No. 65 at 9, *Sanders v. Belle Exploration, Inc.*, No. 1:07-cv-01108 (W.D. La. 5/3/2/10). And this Court has already clarified that the 36-foot foot MSL contour boundary applies to both surface and mineral ownership. *Id.*

However, a review of the allegations, along with Plaintiffs' representations, establish that Plaintiffs do not seek to relitigate the previously determined boundary or expand the lease, as posited by Belle.  ECF No. 43 at 5-6.  Moreover, Belle's own argument acknowledges that the *Crooks* decision was silent as to Belle's mineral lease with the State, and that any effect the decision might have on leases issued prior to judgment is not obvious.[21]  ECF No. 44 at 2.  Belle was not initially a party to the *Crooks* litigation.  However, it states it was later added after a final judgment as to the boundary action.  ECF Nos. 30 at 3, 30-1 at 2.

Additionally, it appears that the alleged cause of action occurred after the state court's final judgment as the allegations at present do not seek to relitigate the boundaries determined by prior litigation and do not seek to relitigate entitlement to royalties from before 2016.  Plaintiffs concede, and it is undisputed, that a boundary action would be precluded as the boundary has been adjudicated to final judgment. Plaintiffs' allegations concern Belle's continued operations and payments to the State after the 2016 judgment and seek payment or recovery for same.  It is not clear that Plaintiffs' claims "existed at the time" of the state court judgment or are the "same as

---

[21] At trial, it was undisputed that the Plaintiffs were only seeking to recover the royalties attributable to the relevant leases during the three years before suit was filed as well as royalties to the present day of that trial.  Thus, the state court awarded the agreed upon recovery the State had received in royalties from May of 2003 to the date of trial.  The district court in *Crooks* in its Written Reasons for Judgment as to attorney fees noted that "in addition to the large monetary award discussed herein, the class members were recognized as the owners of 30,393.84 acres of land and the mineral rights, which should prove to be substantially lucrative, being vested in the landowners." ECF No. 59-2 at 15.  What appears to be in dispute is the parties' interpretations of the Plaintiffs' allegations in the Complaint and Amended Complaint.  But as noted Plaintiffs concede that they do not seek any determination concerning the location of the alleged property line.  Rather, they merely allege the previous determination as an underlying fact for their claims.

those asserted." Thus, Belle's request for dismissal based on *res judicata* or collateral estoppel should be denied.

### D. Plaintiffs fail to state a claim for revendicatory relief.

Defendants seek dismissal of Plaintiffs' revendicatory action for failure to state a claim. ECF Nos. 30, 45, 46, 63, 66, 82, 101, 102, 103, 104. Belle argues Plaintiffs fail to allege that any movables were transferred in bad faith, for less than fair value, or after they had been lost or stolen. ECF No. 30 at 6-7. White River and Day Town argue that Plaintiffs cannot state a claim "for all oil that has previously been sold to date[.]" ECF No. 45-1 at 3. White River and Day Town further argue that the Amended Complaint admits White River has not operated the property since January 31, 2021 and as such Plaintiffs have no revendicatory action against White River. ECF No. 66-1 at 4.

SOG argues Plaintiffs fail to state claims for a revendicatory action because they do not seek return of specific property. ECF No. 46-1 at 6. SOG contends Plaintiffs fail to identify the oil at issue, and if they did, there would be no way to identify it and return it. ECF Nos. 46-1 at 10, 63-1 at 9, 73 at 2. SOG do not concede Plaintiffs had an ownership interest in the oil of which they seek return. ECF No. 63-1 at 8. It asserts the oil and gas is incapable of the sort of identification and segregation as other fungible property that would allow it to be the subject of revendication. *Id.* at 8-9. Invoking the "rule of capture," SOG argues the operator becomes the owner once the oil and gas is removed from the wellhead. *Id.* SOG asserts only one case recognized a revendicatory action related to minerals removed

30

without a landowner's consent, but it was overruled by the Louisiana Supreme Court. *Id.* at 9 (citing *Taylor v. Woodpecker Corp.*, 552 So.2d 81 (La. 3 Cir. 11/8/89), *rev'd*, 562 So.2d 888 (La. 1990).

SOG further contends Plaintiffs do not have an ownership interest in the actual oil removed from the ground but a mineral interest. ECF No. 73 at 2. SOG states the oil wells at issue are subject to unitization agreements, which modifies the rule of capture to ensure each tract receives its just and equitable share of production. *Id.* And it asserts Plaintiffs only would own an interest in a percentage of the production from the wells, shared with other landowners in their unit. *Id.* at 3.

Kepco adopted the respective Defendants' briefs in support of their motion, with no additional argument. ECF Nos. 82, 104.

Plaintiffs opposed and filed an Amended Complaint (ECF No. 59) to allege Belle acted in bad faith by paying royalties to the State, even after it was on notice the State did not own the land and received Plaintiffs' formal demand to cease paying royalties to the State. ECF No. 43 at 11. Plaintiffs further argue that they claim revendicatory relief because the property of Plaintiffs is still being operated by some Defendants and there continues to be production from the property. *Id.* at 13.

Plaintiffs respond that the Amended Complaint (ECF No. 59) cures Defendants' challenges. ECF Nos. 51 at 1, 52 at 3. Plaintiffs state the amendment clarifies the revendicatory action claim by alleging that they seek return of the oil owned by Plaintiffs "that is still in Defendants' possession." *Id.* at 5. They assert no dismissal is necessary as to a revendicatory action for "all minerals previously sold."

31

*Id.* Plaintiffs contend that the amendment and its attachments sufficiently allege that they the return of any minerals removed from their property that are still in Defendants' possession. ECF No. 52 at 3.

Plaintiffs further assert the amended allegations specifically identify the exact wells and date for production and allege that Defendants' record keeping allows for tracking the oil. ECF Nos. 52 at 7, 60 at 6-7. Plaintiffs further state that while White River may presumably have sold all of the minerals it took from their property, Plaintiffs must pursue the revendicatory action until that's admitted or evidenced. ECF No. 71 at 2. Plaintiffs also assert a revendicatory action may be asserted for fungible property. ECF No. 72 at 12-13.

A claim for dispossession of property may arise under La Civ. Code art. 526. It states: "The owner of a thing is entitled to recover it from anyone who possesses or detains it without right and to obtain judgment recognizing his ownership and ordering delivery of the thing to him." A claim under this article is known as a revendicatory action, and it is considered a real action rather than a personal action. *Zadeck v. Treme*, 2022 WL 4280296, *5 (W.D. La. Sept. 15, 2022). The Louisiana Supreme Court has determined that the revendicatory action is an action for the recovery of a moveable transferred: (1) by the owner or legal possessor to a person in bad faith; (2) for less than fair value; or (3) when the moveable was lost or stolen. *Dual Drilling Co. v. Mills Equipment Investments, Inc.,* 721 So.2d 853 (La.12/1/98).

When the defendant is no longer in possession of a plaintiff's property, then the proper remedy is a delictual action in tort (conversion) for the fair market value

32

of the property at the time it was converted. *Gibbs v. Harris*, 799 So.2d 665, 670 (La. App. 2d Cir. 2001).  Because this right to revendication is predicated on a defendant maintaining possession of the property, a revendicatory action "abates when the movable is no longer in possession of the defendant." *Dual Drilling Co.*, 721 So. 2d at 853, n.1.    But a plaintiff may have a personal action for damages or unjust enrichment against the former possessor of the movable.  *Id.*

Here, Plaintiffs' Amended Complaint (ECF No. 59) seeks to recover the oil produced from their land.  Plaintiffs assert Defendants removed minerals from their property in LaSalle Parish.  ECF No. 59 at 1.  They claim that despite judgments holding Plaintiffs to be the owners of both the land and mineral rights, Defendants have continued to take minerals from their land without compensation.  *Id.*  Plaintiffs' allege Defendants have produced oil from their property under an invalid lease with the State on and around the Catahoula Basin from various wells drilled on Plaintiffs' property "at different times and during different periods of production[.]"  *Id.* at 3.  Plaintiffs claim that the leases are nullities based on the ruling in *Crooks*, but Defendants continue to remove minerals without a valid lease or permission and continue to pay royalties to the State.  *Id.* at 5.

Specifically, Plaintiffs allege they seek recovery, individually, against all Defendants for all production obtained by each well on Plaintiffs' property as recovery for property taken under La. Civ. Code art. 526 and 488.  Plaintiffs claim Belle produced well Serial Numbers 228489 and 230026 located on State lease 16827 from

January 1, 2012 to August 31, 2020, and July 31, 2020, respectively, with a combined production totaling over 72,000 barrels of oil over this period.  *Id.* at 5-6.

> Plaintiffs further state:
>
> Belle had a lease with them covering their undivided 1/2 interest in 257 acres which was valid and in force during this period, but that the unit for these wells was 60 acres, approximately 20 of which was covered by an invalid lease with the State, and it is this production for which Plaintiffs were not paid that is at issue in this litigation regarding Belle.

*Id.* at 6.  Plaintiffs allege similar specifics regarding wells produced by Day Town, Kepco, SOG, and White River.  *Id.*  Plaintiffs claim Defendants are in possession of records that allow them to identify the oil produced from the Plaintiffs' wells, and to determine whether it is still in their possession or has been alienated.  *Id.*  Plaintiffs attached copies of the permits and plats of the location of each well.  ECF No. 59-6.  Plaintiff further allege the State sent a letter to producers to escrow royalties from the leases because the State is not a valid lessor of the minerals.[22]  *Id.* at 7.

Through their amended allegations, Plaintiffs add that Defendants were in bad faith for removing the minerals from their property, as the ownership of the land was placed in question as early as May 2006, and the district court found Plaintiffs (and not the State) to be the owners on May 16, 2016.  *Id.*  Plaintiffs allege the findings were affirmed in 2020 and that the rulings were a matter of public record that placed Defendants on notice.  *Id.*  Plaintiffs further allege Defendants received actual notice from the State of the litigation and rulings.  *Id.*  Plaintiffs also sent copies of the

---

[22] Plaintiffs attach to the Amended Complaint (ECF No. 59) an example of a letter from 2020 acknowledging that certain portions, but not all, of Catahoula Lake are actually private property and not owned by the State, and for the lessor to protect their interest due to the uncertainty regarding ownership of the land absent a boundary being established.  ECF No. 59-7.

*Crooks* judgment to Belle, Sanchez, and KEPCO.  *Id.* at 8.  Plaintiffs allege Defendants were without right to remove the minerals under null leases granted by a third-party (the State).  *Id.*

To sustain a cause of action under La. Civ. Code art. 526, Plaintiffs must have ownership of the property on which they base their claims.  But they do not own the fugitive minerals themselves until they have been reduced to possession.  La. R.S. 31:6-7.[23]  Plaintiff seek recovery of the minerals removed from their property.  ECF No. 59.  The alleged minerals themselves would not be classified as fruits, but would

---

[23] Belle asserts Plaintiffs fail to state the ownership of the oil belongs to them.  ECF No. 30-1 at 8.  Belle claims ownership of the land does not necessarily include ownership of the minerals, citing the "rule of capture."  *Id.*  Plaintiffs allegations that the mineral leases by the State to Defendants are "nullities" and "null and/or void *ab initio*" is unsupported.  ECF No. 70 at 3-4.  Louisiana law allows a mineral lease from a non-owner binding between the parties, even when the lessor is not the owner.  *Id.* at 4.  Belle claims this proposition is supported by *Crooks*, which was silent as to the effect on mineral leases previously granted, and which ordered the State to pay royalties it had received from the leases to the recognized landowners.  *Id.*  Similarly, Belle asserts that if Plaintiffs are deemed to be the true owners of the property covered by Belle's lease with the State, then Plaintiffs' claim would be against the State for those royalties.  *Id.* at 5.

Belle further argues that the Resolution adopted by the Louisiana State Mineral and Energy Board ("Mineral Board") on February 13, 2019 – and attached to the Amended Complaint – does not support Plaintiffs' claims.  *Id.*  Rather, the Resolution shows Belle requested permission to pay royalties into escrow in order to not violate its obligations under the leases, in light of the discovery of a potentially *bona fide* dispute as to mineral rights ownership.  *Id.* at 6.  The Mineral Board granted permission, but Belle asserts its obligations under the leases did not abate.  *Id.*  And the Resolution requires Belle to comply with all royalty payment schedules under the lease during the period of diversion of payment.  *Id.* at 6-7.

"Ownership of land does not include ownership of oil, gas, and other minerals occurring naturally in liquid or gaseous form, or of any elements or compounds in solution, emulsion, or association with such minerals. The landowner has the exclusive right to explore and develop his property for the production of such minerals and to reduce them to possession and ownership." La. R.S. 31:6.  "Minerals are reduced to possession when they are under physical control that permits delivery to another." La. R.S. 31:7.  Thus, while landowners own the right to explore and develop their property for minerals; they do not own the oil and gas beneath their land unless and until such minerals are reduced to possession.

be a product, as it is derived "as a result of a diminution of its substance." *Todd v. State, Through Dep't of Nat. Res.*, 474 So.2d 430, 434 (La. 1985).

> Under La Civ. Code art. 488,
>
> Products derived from a thing as a result of diminution of its substance *belong to the owner of that thing*. When they are reclaimed by the owner, a possessor in good faith has the right to reimbursement of his expenses. A possessor in bad faith does not have this right.

La. Civ. Code art. 488 (emphasis added).[24]  Thus, a possessor in good faith, who may keep fruits, must return products to the owner on demand, but is entitled to reimbursement of his expenses. *Todd*, 474 So.2d at 434 (citing La. Civ. Code art. 488).

However, the provisions of the Mineral Code trump in the event of a conflict between its provisions and those of the Civil Code.  La. R.S. 31:2.  Where the Mineral Code does not expressly or impliedly provide for a particular situation the Civil Code or other laws are applicable.  *Id.*

Plaintiffs acknowledge all of the wells from which they allege minerals were produced are unitized.  ECF No. 43 at 18; *see also Sanders*, 481 Fed.Appx. at 100 (acknowledging unitization in 2002 of relevant leased lands); ECF No. 73-1. Even absent admission that the wells are unitized, the Louisiana Department of

---

[24] The United States Court of Appeals for the Fifth Circuit recently noted that under Article 488, "a landowner may recover products taken from his land without his consent[.]"  *Mary v. QEP Energy Co.*, 24 F.4th 411, 418 (5th Cir. 2022), *cert. denied*, 143 S.Ct. 93; 214 L.Ed.2d 18 (2022).  In *Mary*, the Fifth Circuit found that the gas at issue was not taken from the landowner's land, but was produced from a well located on the neighbor's land.  *Id.* However, the Fifth Circuit observed that even if the well "ultimately drained gas from Marys' land, Article 14 of the Mineral Code would bar the Marys from recovering the value of this gas." *Id.* at n.23 (finding no clear path to disgorgement under the plain language of the Code where energy company's pipelines strayed outside of a servitude granted by landowners).

Conservation may utilize unitization without the consent of a particular landowner.

This Court has recognized that:

> "[T]he Commissioner of Conservation has the power to establish drilling units and "designate a drilling site 'at the optimum position in the drilling unit for the most efficient and economic drainage of such unit.' " *See id.* "The Commissioner must also issue a permit before the well can be drilled, and the issuance of the permit . . . is sufficient authorization to the holder of the permit to enter upon the property covered by the permit and to drill in search of minerals thereon.

*Teekell v. Chesapeake Operating, Inc.*, CIV.A. 12-0044, 2012 WL 2049922, at *3

(W.D. La. June 6, 2012). And this Court observed that:

> [U]nitization takes place pursuant to a permit of the Commissioner of Conservation and not the consent of the landowner. A landowner cannot prevent the establishment of a unit and, in fact, a unit can be established directly against the wishes of a landowner. A landowner in a unit does not have the right to choose the operator of the unit or the location of the drilling site. Moreover, a landowner is not allowed to keep all of the production from drilling on his property. Rather, he must share the production with the others in his unit.

*Id.* at 4.[25]

The Mineral Code provides a statutory scheme upon which an unleased owner must rely for protection of its rights in the absence of a lease or contract with the operator. *See B.A. Kelly Land*, 25 F.4th at 379-80. When the operator has no contract with an interest owner in a compulsory unit, the forced pooling statutory regime establishes a "quasi-contractual relationship," whereby the legislature provides the

---

[25] "A drilling and production unit combines all the land over a reservoir into a single "unit" and allocates all the production from it to the various landowners. The Commissioner of Conservation determines the percentage of production allocated to each landowner. Generally, the percentage corresponds to the proportion of each owner's land in the unit." *Gladney v. Anglo-Dutch Energy, L.L.C.*, 2016-468, p. 3 (La.App. 3 Cir. 12/21/16); 210 So.3d 903, 905, *writ denied*, 2017-0365 (La. 4/13/17); 218 So.3d 120.

terms of the contract, such as how to allocate well costs, how to allocate production or the proceeds of production, and how the operator should provide an accounting of production, costs, and revenue. *Wells*, 89 So. 3d at 1149 ("A quasi-contractual relationship is created between the unit operator and the unleased mineral interest owner with whom the operator has not entered into contract," and "Louisiana jurisprudence provides that a claim against the operator of a unit well brought by the owners of unleased mineral interests in the production unit seeking their statutory share of production from the well is grounded in quasi-contract.").

Neither the parties nor the Court found jurisprudence recognizing a revendicatory action in the context of a claim for the return of the extracted oil and gas. And the cases cited by Plaintiffs in support of revendicatory action in this context are inapposite.

In reviewing the Amended Complaint, and accepting the factual allegations as true, Plaintiffs fail to allege a plausible revendicatory action against Defendants.

### E.    Plaintiffs' claims have not prescribed.

Belle and SOG argue Plaintiffs' causes of action under La. Civ. Code arts. 2305 and 2299 are barred by a ten-year prescriptive period. ECF Nos. 30 at 7, 46 at 1.

Belle states Plaintiffs' claims arise from allegedly invalid lease contracts issued by the State to Defendants, including Belle. ECF No. 30 at 7. And they argue that Plaintiffs do not state when payments for the allegedly improper production began or when Plaintiffs learned of them, as they refer to production "over the years." *Id.* The mineral lease issued to Belle was executed in 2000 and Plaintiffs claim the State owes

royalty payments to riparian landowners for production from 2003 to 2016. *Id.* Belle argues that it appears Plaintiffs seek restitution for the invalid payments beginning in 2003, more than ten years ago. *Id.* Thus, Belle states these claims are time-barred.

SOG argues Plaintiffs cannot circumvent the three-year prescriptive period by characterizing their claims as "breach of contract," but regardless, are subject to a ten year prescriptive period for their quasi-contract claims. ECF No. 46-1 at 16-17. SOG argues Plaintiffs – who were included within the *Crooks* class action – were well aware of the nature of their ownership claims of the underlying land, as well as the fact that they were subject to mineral leases entered into by the State, for decades prior to filing suit. *Id.* at 17. Thus, SOG contends Plaintiffs knew as early as December 7, 2011, if not much earlier, of the basis for their purported claims for failure to pay oil royalties. *Id.* SOG asserts Plaintiffs failed to bring any action until December 30, 2021, after the ten-year prescriptive period passed. *Id.*

Plaintiffs admit prescription on any quasi-contractual claims would be ten years. ECF No. 43 at 15. Plaintiffs seek to recover the value of any oil produced ten years back from the date of filing of the Complaint – December 30, 2021 – forward. *Id.* Plaintiffs argue most of the wells listed in the Complaint are still being produced by one or more Defendants and their related entities, and they seek recovery for the continued production. *Id.* at 16.

A claim for payment of a thing not owed sounds in quasi-contract. *Carriere v. Jackson Hewitt Tax Serv. Inc.*, 750 F.Supp.2d 694, 710 (E.D. La. 2010) (citing *Onstott v. Certified Capital Corp.,* 950 So.2d 744, 747 (La.App. 1 Cir. 11/3/06); *Julien v.*

*Wayne,* 415 So.2d 540, 542 (La.App. 1 Cir.1982)).   Similarly, a claim for unjust

enrichment is quasi-contractual. *Gulfstream Services, Inc. v. Hot Energy Services,*

*Inc.,* 04–1223 (La.App. 1 Cir. 3/24/05), 907 So.2d 96, 100, *writ denied,* 05–1064

(La.6/17/05), 904 So.2d 706.

"Claims that are quasi-contractual in nature, such as a claim for production or

the proceeds of the sale of production from a forced pool unit, are subject to the

general ten-year period for personal actions." *Dow Constr., LLC v. BPX Operating*

*Co.*, 603 F.Supp.3d 442, 446 (W.D. La.2022) (citing *Wells v. Zadeck*, 2011-1232 (La.

3/30/12), 89 So. 3d 1145, 1149; *Taylor v. Smith*, 619 So. 2d 881, 886–88 (La. App. 3

Cir. 1993)); *see also Weyerhaeuser Co. v. Pardee Minerals, LLC*, 2018 WL 3210027,

at *3 (W.D. La. June 28, 2018) ("Actions for payment of a thing not due are personal

actions which prescribe ten years from the date of payment or ten years from the date

that plaintiff knew or should have known of the overpayment."). "Generally,

prescription statutes are strictly construed against prescription and in favor of the

claim sought to be extinguished by it; thus, of two possible constructions, that which

favors maintaining, as opposed to barring an action, should be adopted." *Wells v.*

*Zadeck*, 2011-1232 (La. 3/30/12, 6–7); 89 So.3d 1145, 1149 (citations omitted).

Here, the parties agree that a ten-year prescriptive period applies to Plaintiffs'

quasi-contractual claims under La. Civ. Code arts. 2305 and 2299.   Plaintiffs'

allegations clearly seek relief under quasi-contractual theories.   ECF No. 59.

Plaintiffs seek payment for Defendants' production over the last ten years under

allegedly invalid mineral leases subsequent to Defendants being put on notice that

the State's ownership was in question and the 2016 Third Circuit ruling holding that Plaintiffs are the owners. ECF No. 59. Plaintiffs seek the value of the minerals alienated by Defendants over the course of the ten years preceding the filing of their Complaint. The Court finds Plaintiffs have alleged sufficient facts to survive a prescription challenge.

### F. Plaintiffs state sufficient claims under La. Civ. Code arts. 2299 and 2305 for recovery of a thing not owed.

Belle and SOG contend that Plaintiffs fail to state claims under La. Civ. Code arts. 2299 and 2305. ECF Nos. 30 at 7, 46 at 1. Kepco joins and adopts the motions, with no additional briefing. ECF No. 82.

Belle contends Plaintiffs' claims under arts. 2299 and 2305 fail because, even assuming Belle received payment for oil for which it was not owed, the statute requires Belle to return payment to the State, not Plaintiffs. ECF No. 30 at 8. Regardless, Belle contends it did nothing improper and that it currently has a lease with the State which obligates it to pay royalties to the State. ECF No. 44 at 3. Belle states that if Plaintiffs wish to amend the lease, the proper party to pursue would be the State. *Id.* Belle contends it is in an impossible situation: if it pays royalties to the State, they risk suit for improperly taking their minerals; if it acquiesces to Plaintiffs' demands, it breaches its contractual obligations to the State. *Id.* And Belle contends it does not have the unilateral right to dissolve or amend the lease. *Id.* Belle argues Plaintiffs fail to allege any wrongdoing that would obligate them to make Plaintiffs whole. *Id.* at 4.

41

Belle contends Plaintiffs do not show they own the oil in dispute. *Id.* Plaintiffs' claims are premised upon the assumption that as owners of the land that they also own the oil produced from that land. *Id.* Belle contends La. R.S. 31:6 establishes ownership of land does not include ownership of oil. *Id.* Belle further argues that *Crooks* was silent on the effectiveness of the State-issued mineral leases and that the Court did not disturb the award of royalties against the State but did not address developers or producers of the oil. *Id.* at 9. Thus, Belle asserts Plaintiffs fail to show Belle's development operations were improper. *Id.*

SOG argues Plaintiffs' claims under La. Civ. Code arts. 2299 and/or 2305 fail because Plaintiffs must allege they have no other right of action. ECF No. 46-1 at 10. SOG states that, regardless, Plaintiffs' claims fail because they admit SOG had a justification for its enrichment. *Id.* SOG contends that Plaintiffs have alleged substantive claims against the State in the underlying state Court action, wherein the Louisiana Supreme Court held that Plaintiffs had claims for inverse condemnation and an action to recover production proceeds against the State. *Id.* at 12. SOG further contends that the allege "enrichment" was through a valid contract with the State. *Id.* at 14. SOG argues Plaintiffs fail to allege any extra-contractual action was taken by SOG or any sort of collusion or wrongdoing by SOG with the State. *Id.* at 15. Thus, SOG contends Plaintiffs cannot state a claim for unjust enrichment. *Id.* at 14-15.

SOG also contends Plaintiffs fail to state claims under art. 2299 because they fail to allege a direct relationship or any direct transfer of any payment between Plaintiffs and SOG.  ECF No. 63-1 at 12-13.

Plaintiffs respond that a cause of action for unjust enrichment lies under the civil code articles for payment not due yet where Defendants disposed of produced oil. ECF No. 43 at 13-14 (citing *Dual Drilling Co. v. Mills Equip. Invs., Inc.*, 721 So.2d 853, n. 1, 2 (La. 12/1/98)).  Plaintiffs argue that as owner of the land, they have the exclusive right to explore the minerals under their land.  ECF No. 43 at 16.  They contend they became the owners of the oil once it was taken from into possession from the land they owned, citing La. R.S. 31:6.  *Id.*  Plaintiffs claim they are entitled to its return, not the State.  *Id.* at 17.

Plaintiffs assert that all of the wells at issue in this matter are unitized and that Louisiana courts recognize the rights of landowners in drilling units where minerals have been produced and the unleased owners have not been paid, but the leases were granted by other landowners in the unit.  *Id.* at 18-19 (citing cases recognizing a quasi-contract cause of action).  Plaintiffs assert the unit producers (here Defendants) owe them as the unleased owners the value of production under receipt of a thing not due.  *Id.* at 19.

Plaintiffs further assert that the "Rule of Capture" which Belle contends made Belle the owner of the oil is inapplicable here.  *Id.* at 19.  Plaintiffs argue this rule was to allow an operator who had a valid lease or other real right in the property to proceed with operations until the appropriate unit order was issued.  *Id.* at 21.

However, Plaintiffs contend this was never intended to give those without a real right a license to drill. *Id.*

Plaintiffs filed an Amended Complaint (ECF No. 59) to include additional allegations against Belle. Although they contend the amendment fails to cure the deficiencies, Belle concedes the amendment now claims Belle acted in bad faith when they continued to develop the property after the *Crooks* suit in 2006. ECF No. 70 at 1-2. But Belle asserts this is a conclusory assertion. *Id.*

Plaintiffs respond to SOG's arguments, asserting they mischaracterize Article 2299 as it is not limited to formal "payments." ECF No. 72 at 13. Plaintiffs allege SOG directly "received" the oil by personally removing the minerals from the ground. *Id.* Plaintiffs note the article imposes a duty of reimbursement on "a person who received a payment *or* at thing not owed." *Id.* at 14 (emphasis added by Plaintiffs). Thus, Plaintiffs claim no actual "payment" is required, but the same facts give rise to a quasi-contractual claim when a person receives a "thing" not owed. *Id.* at 15-16. And Plaintiffs allege that SOG as a producer directly "received" the oil from Plaintiffs' property that were not "owed." *Id.* at 20. Plaintiffs also argue that they do not allege fraud or any torts claims but allege that the State had no interest in the oil and gas to grant any leases to SOG to remove the minerals. *Id.* at 17. Thus, Plaintiffs claim the oil was removed by SOG without right but not "owed." *Id.*

SOG responds that it is the lack of transfer from the Plaintiffs to Defendants that remains deficient. ECF No. 73. SOG contends that it is the State who possessed the land at the time and leased the land, acting as a conduit. *Id.* at 6.

"Article 2299 requires that the thing not owed must be restored to the person from whom it was received." *United States v. Cytogel Pharma, LLC*, 2018 WL 5297753, at *10 (E.D. La. Oct. 25, 2018).[26]  "Louisiana courts have held Article 2299 'is limited to the situation in which one person gives something of value to another because of a perceived obligation to that other, when in fact no obligation exists. It does not apply when a third party, who is not acting as the agent of either the giver or the receiver is the conduit." *Id.*  "Louisiana Civil Code Article 2303 provides that, if the receipt was in bad faith, the receiver must restore not only the thing not owed, but also its fruits and products.  This article does not create a cause of action in a third party." *Id.*[27]

---

[26] Under La. Civ. Code art. 2300, "[a] thing is not owed when it is paid or delivered for the discharge of an obligation that does not exist."

[27] Concerning this issue, the United States District Court of the Eastern District of Louisiana observed:

> Additionally, the case law on this particular issue, though sparse, suggests that it is arguable at best as to whether McDowell can be held liable for payment of a thing not owed. *See Soileau v. ABC Ins. Co.*, 02-1301 (La. App. 3 Cir. 10/3/03)*Soileau v. ABC Ins. Co.*, 02-1301 (La. App. 3 Cir. 10/3/03); 844 So. 2d 108 (agreeing with the trial court that Article 2299 "does not apply when a third party, who is not acting as the agent of either the giver or the receiver is the conduit" but also that Article 2299 is "limited to the situation in which one person gives something of value to another because of a perceived obligation to that other, when in fact no obligation exists" and that "the direct relationship of two parties interacting, one as the giver of a payment or thing and the other as the recipient of the payment or thing" is an "essential element" of an Article 2299 claim); *see also Gallo v. Gallo*, 03-794 (La. 12/3/03)*Gallo v. Gallo*, 03-794 (La. 12/3/03); 861 So. 2d 168 (upholding the denial of a claim for payment of a thing not owed where the defendant-mother was deemed not to have received any payment from the plaintiff-father for child support payments that he had made for a child that turned out not to be his and noting that "because the child support payments were received by the child, through the mother, the mother was not a person who received a payment not owed her, a requirement imposed by [Article] 2299 for reimbursement to be made"); *cf. Stewart v. Ruston La. Hosp. Co. LLC*, No. 14-83, 2016 WL 1715192, at *9 (W.D. La. Apr.

Under article 2304:

> When the thing not owed is an immovable or a corporeal movable, the person who received it is bound to restore the thing itself, if it exists. If the thing has been destroyed, damaged, or cannot be returned, a person who received the thing in good faith is bound to restore its value if the loss was caused by his fault. A person who received the thing in bad faith is bound to restore its value even if the loss was not caused by his fault.

La. Civ. Code art. 2304.  But "[a] person who in good faith alienated a thing not owed to him is only bound to restore whatever he obtained from the alienation." La. Civ. Code art. 2305.  "If he received the thing in bad faith, he owes, in addition, damages to the person to whom restoration is due." *Id.*

"The dispossessed owner of a movable may have, apart from the revendicatory action, a claim for the return of the movable or its value under the rules of the Civil Code governing the payment of a thing not owed." 2 La. Civ. L. Treatise, Property § 13:13 (5th ed.) (citing La. Civ. Code art. 2299; *Busse v. Lambert*, 773 So.2d 182 (La. Ct. App. 5th Cir. 2000)).  "Anyone enriched without cause at the expense of another is under a quasi-contractual obligation to restore corporeal movables, if they remain, and if they no longer exist, to account for the enrichment." *Id.* (citing La. Civ. Code arts. 2304, 2306).

Here, to the extent the oil has been sold, Plaintiffs seek recovery of the value of the oil under La. Civ. Code arts. 2299, 2303, 2304, and 2305.  ECF No. 59 at 9.

---

27, 2016) (James, J.) (finding Article 2299 to be "inapplicable" because the defendant "did not receive any payment whatsoever" from the plaintiffs).

*Galliano Marine Serv. LLC v. Schumacher*, CV 17-9868, 2018 WL 3727762, at *3 (E.D. La. Aug. 6, 2018).

Plaintiffs allege plausible claims for recovery of a thing not owed. Plaintiffs allege Defendants "received" a "thing (oil) that was not owed to [them]" and thus are bound to restore the minerals. ECF No. 59 at 10. Plaintiffs allege fault is immaterial under La. Civ. Code art. 2299, thus Defendants are obligated to return the value of the oil received from Plaintiffs regardless of whether Defendants acted in good faith. *Id.* Plaintiffs seek the full value of the minerals, along with the fruits and products without a reduction in expenses since the time that Defendants received actual or constructive notice that the leases with the State were invalid. *Id.*

 This Court has recently acknowledged that "the law does not compel 'an election of remedies between a contractual theory and an unjust enrichment theory prior to filing a complaint.'" *Shanghai Breeze Tech. Co., Ltd. v. Gravois Aluminum Boats, LLC*, 6:22-CV-02038, 2023 WL 1926609, at *5 (W.D. La. Jan. 25, 2023), *report and recommendation adopted*, CV 6:22-2038, 2023 WL 2950991 (W.D. La. Mar. 1, 2023) (citing *Schott, Trustee for Estate of InforMD, LLC v. Massengale*, 2019 WL 4738795 at *16 (M.D. La.)).[28] This Court held that where there is a question of

---

[28] This Court holds that:

> Rule 8(d) permits a plaintiff to assert alternative and inconsistent causes of action. While Shanghai did not use the phrase "in the alternative" in pleading the unjust enrichment claim, it could assert such an equitable claim even if it is inconsistent with any action at law. "[T]he law does not compel 'an election of remedies between a contractual theory and an unjust enrichment theory prior to filing a complaint.' " *Schott, Trustee for Estate of InforMD, LLC v. Massengale*, 2019 WL 4738795 at *16 (M.D. La.) (quoting *Prop. One, Inc. v. USAgencies, LLC*, 830 F. Supp. 2d 170, 181 (M.D. La. 2011)).

*Shanghai Breeze Tech. Co., Ltd. v. Gravois Aluminum Boats, LLC*, 6:22-CV-02038, 2023 WL 1926609, at *5 (W.D. La. Jan. 25, 2023), *report and recommendation adopted*, CV 6:22-2038, 2023 WL 2950991 (W.D. La. Mar. 1, 2023). Louisiana's federal district courts are divided on whether Rule 8 permits a plaintiff to plead unjust enrichment in the alternative. *See Bureau*

whether a contractual theory provides a remedy for the damages suffered by a plaintiff, a viable alternative unjust enrichment claim exists. *Id.*; *see also Schott*, 2019 WL 4738795 at *17. "The Revision Comments of Article 2299 clearly state that the remedy provided by the article is not subsidiary and is available even if other remedies are also available." *BP Am. Prod. Co. v. R.D. Briscoe, Inc.*, CIV A 08-1895, 2009 WL 2849528, at *4 (W.D. La. Sept. 2, 2009) (citing La. Civ. Code art. 2299, Comment (c)).[29]

The factual allegations in the Amended Complaint (ECF No. 59) easily raise a right to relief above the speculative level for recovery of a thing not owed.

### G. Plaintiffs' Amended Complaint (ECF No. 59) meets the pleading standard of Rule 8.

Federal Rule of Civil Procedure 12(e) provides that a motion for more definite statement may be filed when ". . . a pleading to which a responsive pleading is permitted is so vague or ambiguous that a party cannot reasonably be required to frame a responsive pleading . . . ." Fed. R. Civ. P. 12(e). The standard for evaluating a motion for more definite statement is whether the complaint is so "excessively vague and ambiguous as to be unintelligible and as to prejudice the defendant seriously in attempting to answer it." *Babcock & Wilcox Co. v. McGriff, Seibels & Williams, Inc.*,

---

*Veritas Commodities & Trade, Inc. v. Nanoo*, CV 20-3374, 2021 WL 2142466, at *7–8 (E.D. La. May 26, 2021) (discussing cases).

[29] The comments to Article 2299 provides: "[T]his remedy is available even if other remedies are also available but there can be no double recovery . . . Thus, a plaintiff may choose to bring an action in revendication, an action in tort, an action grounded on enrichment without cause, or an action grounded on Article 2299 for the return of a thing not owed." La. Civ. Code art. 2299, Comment (c).

235 F.R.D. 632, 633 (E.D. La. 2006), *citing Advanced Communications Technologies, Inc. v. Li*, No. 05 Civ. 4628, 2005 WL 3215222, at *3 (S.D.N.Y. Nov. 30, 2005) (citing *Bower v. Weisman*, 639 F.Supp. 532, 538 (S.D.N.Y. 1986)).

When evaluating a motion for more definite statement, a Court must assess a complaint in light of the minimal pleading requirements of Rule 8 of the Federal Rules of Civil Procedure, which provides, in relevant part, only "a short and plain statement of the claim showing that the pleader is entitled to relief." *Babcock*, 235 F.R.D. at 633; *see also* Fed. R. Civ. P. 8(a)(2). Additionally, due to the availability of extensive discovery on a plaintiff's claim, Rule 12(e) motions are disfavored. *City of DeQuincy v. Emps. Mut. Cas. Co.,* 2023 WL 2604022, at *1 (W.D. La. Mar. 22, 2023)

Accordingly, such motions are inappropriate when the pleading meets the standards of Rule 8, the information is already known to the defendant, or the information sought can otherwise be obtained by discovery. *Id.*

Here, Plaintiffs have complied with the requirements of Rule 8, as the Plaintiffs' Amended Complaint (ECF No. 59) contains a short and plain statement of the claims asserted. The Amended Complaint (ECF No. 59) and included attachments provide fair notice to Defendants of the claims alleged.

Thus, to the extent White River, Day Town, and Kepco seek a more definite statement (ECF Nos. 45, 66, 82, 102, 104), it should be denied.

## III.  Conclusion

Defendants' Rule 12(b)(6) Motions to Dismiss (ECF Nos. 30, 45, 46, 63, 66, 82, 101, 102, 103, 104) should be DENIED IN PART and GRANTED IN PART, as follows:

Because Plaintiffs' claims are not barred by *res judicata* or collateral estoppel, Belle's Rule 12(b)(6) Motions to Dismiss (ECF Nos. 30, 103) should be DENIED IN PART on that basis.

Because Plaintiffs fail to state a claim for revendicatory relief, Defendants' Rule 12(b)(6) Motions to Dismiss (ECF Nos. 30, 45, 46, 63, 66, 82, 101, 103, 104) should be GRANTED IN PART to the extent they seek dismissal of Plaintiffs' revendicatory claim. Plaintiffs' claims for revendicatory relief against Defendants should be DISMISSED WITH PREJUDICE.

Because Plaintiffs' claims under La. Civ. Code arts. 2305 and 2299 are not prescribed, Belle's Rule 12(b)(6) Motions to Dismiss (ECF No. 30, 103) and SOG's Rule 12(b)(6) Motions to Dismiss (ECF Nos. 46, 63, 101) should be DENIED IN PART to the extent they seek dismissal of those claims as prescribed.

Because Plaintiffs state sufficient claims for relief under La. Civ. Code arts. 2299 and 2305 for recovery of a thing not owed, Belle's Rule 12(b)(6) Motions to Dismiss (ECF Nos. 30, 103), SOG's Rule 12(b)(6) Motions to Dismiss (ECF Nos. 46, 63, 101), and Kepco's Rule 12(b)(6) Motion to Dismiss (ECF Nos. 82, 104) should be DENIED IN PART to the extent they seek dismissal of those claims.

Because Plaintiffs' Amended Complaint (ECF No. 59) complies with the requirements of Rule 8, White River's, Day Town's, and Kepco's Rule 12(e) Motions for More Definite Statement (ECF Nos. 45, 66, 82, 102, 204) should be DENIED.

Under the provisions of 28 U.S.C. § 636(b)(1)(c) and Fed.R.Civ.P. 72(b), parties aggrieved by this Report and Recommendation have fourteen (14) calendar days from

service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.  No other briefs (such as supplemental objections, reply briefs, etc.) may be filed.  Providing a courtesy copy of the objection to the undersigned is neither required nor encouraged. Timely objections will be considered by the District Judge before a final ruling.

Failure to file written objections to the proposed findings, conclusions, and recommendations contained in this Report and Recommendation within fourteen (14) days from the date of its service, or within the time frame authorized by Fed.R.Civ.P. 6(b), shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the District Judge, except upon grounds of plain error.

THUS DONE AND SIGNED in Alexandria, Louisiana, on this 5th day of August 2023.

JOSEPH H.L. PEREZ-MONTES
UNITED STATES MAGISTRATE JUDGE